**Angel GOOD, et al., Plaintiffs,**

v.

**FLUOR DANIEL CORPORATION, et al., Defendants.**

**Arthur Aylsworth, et al., Plaintiffs,**

v.

**Fluor Daniel Corporation, et al., Defendants.**

**Nos. CT–00–5021–EFS, CY–00–3038–EFS.**

United States District Court, E.D. Washington.

Sept. 11, 2002.

Scott A. Johnson, Todd M. Johnson, Johnson Law Group, LLP, Minnetonka, MN, Hugh V. Plunket, III, Robert K. Shelquist, J. Michael Schwartz, Lockridge, Grindal, Nauen, PLLP, Minneapolis, MN, Richard C. Eymann, Eymann, Allison, Fennessy, Hunter & Jones PS, Spokane, WA, for Plaintiffs.

William Randolph Squires, III, Summit Law Group, Seattle, WA, Michael B. Saunders, Larry E. Halvorson, Halvorson & Saunders PLLC, Seattle, WA, for Fluor Daniel Corp.

Richard W. Oehler, Perkins Coie LLP, James R. McCullagh, Seattle, WA, for McDermott Intern.

Michael Jon Myers, Randall & Danskin PS, Spokane, WA, for John Smith.

James Bernard King, Keefe, King & Bowman, Spokane, WA, for Kadlec Medical Center.

ORDER GRANTING DEFENDANTS' MOTION TO EXCLUDE OPINION TESTIMONY OF PLAINTIFF'S EXPERTS DR. WILLIAM W. AU AND WOLFGANG HOFFMAN UNDER EVIDENCE RULE 702 AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT DISMISSAL OF PLAINTIFF'S PLA AND STATE LAW CLAIMS

SHEA, District Judge.

On April 25, 2002, the Court heard argument on Co–Defendants B & W Hanford Company's and Fluor Hanford Company's Motion to Exclude Opinion Testimony of Plaintiff's Experts Dr. William W. Au and Wolfgang Hoffman Under Evidence Rule 702, (Ct.Rec.161).[1] The Court also heard argument on Co–Defendants Fluor and BWHC's Motion for Summary Judgment Dismissal of Plaintiff's PLA and State Law Claims, (Ct.Rec.165). The parties were represented at the hearing as set forth in this Court's minutes of that hearing, (Ct. Rec.214). The Court hereby **grants** Defendants' motion to exclude expert testimony under rule 702, **grants in part and denies in part** Defendants' motion for summary judgment, and **retains** jurisdiction of the state law claims pursuant to 28 U.S.C. § 1367(a).

### I. Factual Background and Procedural History

On May 14, 1997, at 7:53 p.m., a chemical explosion occurred in Room 40 of the Plutonium Reclamation Facility ("PRF") in the Plutonium Finishing Plant ("PFP") at the Hanford Nuclear Reservation. That explosion occurred due to "an autocatalytic chemical reaction of the solution stored in

---

**1.** For brevity and simplicity, the Court will only refer in the body of this Order to the documents as they were filed in *Good v. Fluor Daniel Corporation*, CT–00–5021–EFS. However, the cases were consolidated for the jurisdictional issue addressed by this order. *See* Minutes of April 20, 2001, Hearing. The findings and conclusions apply equally to both cases.

Tank A–109, in Room 40 of the PRF." (Ct. Rec. 180 Ex. 14 at 4.) The Plaintiffs in these cases consist of thirteen workers who were in the vicinity of the PRF at the time of the explosion ("the Worker Plaintiffs"), as well as twenty-eight family members of the Worker Plaintiffs ("Family Plaintiffs").

The present suits with both federal and state law claims were filed on March 31, 2000, and May 15, 2000. (Ct.Rec.1.) The sole basis for federal subject matter jurisdiction is a Public Liability Action ("PLA") claim under the Price–Anderson Act, 42 U.S.C. § 2210, *et seq.*, which confers federal jurisdiction over any public liability action arising out of, or resulting from a nuclear incident.[2] *See* 28 U.S.C. § 2210(n)(2). Almost immediately, several of the defendants moved for varying forms of dismissal.

On November 9, 2000, the Court heard argument on many of them. (Ct.Rec.111.) Following that hearing, the Court entered an Order, dated November 30, 2000. (Ct. Rec.113.) The Court held that "an essential element of a PLA claim . . . is that the exposure exceeded limits mandated by federal regulations. . . . For 'general employees' such as Plaintiffs, the allowable dose

limit is 5 rems per year. 10 C.F.R. § 835.202(a)(1)." (Ct. Rec. 113 at 2 ll. 27–28—3 ll. 1–6 (citations omitted).) The Court further stated that "there are plenty of references to hazardous and toxic waste, but that is not relevant to a PLA claim, and when it comes to spelling out the levels of radioactivity to which Plaintiffs were exposed, the Complaint falls short." (*Id.* at 3 ll. 8–10.) However, the Court reasoned that outright dismissal at that stage was not warranted: "limited discovery is warranted to address the big issue; *i.e.* were Plaintiffs exposed to excessive radiation?" (*Id.* at ll. 13–14.) Consequently, the Court ordered discovery "limited to the issue of whether Plaintiffs received a dose of radiation in excess of the limits established by federal regulation." (*Id.* at 4 ll. 2–3.) Denying the motions, the Court finally ordered that "all motions pending will be deemed automatically renewed when the limited discovery provided for above has been accomplished, and BWXT (or any other Defendant), is prepared to test the PLA claims in a summary judgment proceeding." (*Id.* at ll. 9–11.)

Following the November 30, 2000, Order, the parties engaged in limited discov-

**2.** This form of federal jurisdiction is known as federal question jurisdiction, meaning that the claim alleges a cause of action created by federal law. In addition to the federal claim, the Complaint pled ten state law claims: (1) negligence and negligence per se, a Washington common law tort, *see e.g. Sternoff Metals Corporation v. Vertecs Corporation,* 39 Wash. App. 333, 693 P.2d 175, 179 (1984); *see also Pudmaroff v. Allen,* 138 Wash.2d 55, 68, 977 P.2d 574, 580 (1999) (holding that while a violation of statute is not negligence per se, R.C.W. 5.40.050 does not prevent the court from finding negligence as a matter of law); (2) absolute or strict liability for abnormally dangerous or ultrahazardous activity, a Washington common law tort, *see e.g. Klein v. Pyrodyne Corp.,* 117 Wash.2d 1, 6, 810 P.2d 917, 920 (1991); (3) injury resulting from a violation of the Washington Hazardous Waste

Management Disposal Act, R.C.W. 70.105.097; (4) Outrageous Conduct and Intentional Infliction of Emotional Distress, a Washington common law tort, *see e.g. Rice v. Janovich,* 109 Wash.2d 48, 61 742 P.2d 1230, 1238 (1987); (5) Negligent Infliction of Emotional Distress, a Washington common law tort, *see e.g. Hunsley v. Giard,* 87 Wash.2d 424, 435, 553 P.2d 1096, 1102–03 (1976); (6) Fraud/Misrepresentation/Concealment, a Washington common law tort, *see e.g. North Pac. Plywood, Inc. v. Access Road Builders, Inc.,* 29 Wash.App. 228, 233, 628 P.2d 482, 485 (1981); (7) Medical Malpractice, arising under R.C.W. 7.70.010–.130; (8) Fear of Cancer, a variant on the Washington common law tort of negligence, *cf. Koker v. Armstrong Cork, Inc.,* 60 Wash.App. 466, 804 P.2d 659 (1991); (9) Gross Negligence; and (10) Injunctive Relief.

ery. Upon stipulation of the parties, the Court entered a Scheduling Order on June 29, 2001, which established deadlines for the completion of the ordered discovery. (Ct. Rec. 134.) Again on stipulation of the parties, the Court revised that scheduling order to extend several cutoffs. (*See* Ct. Rec. 148.) Pursuant to this Court's Revised Scheduling Order on Price–Anderson Jurisdictional Issue, any motions relating to the Court's jurisdiction over this case were to be filed by January 7, 2002. (Ct. Rec. 148 at 5.) That order also set up deadlines regarding the discovery process for such motions. *Id.* Because the Defendants were not satisfied with the Plaintiffs' performance of that order, they filed a Motion to Strike Plaintiff's Expert Opinions, (Ct.Rec.149). That motion was originally noted for hearing on December 28, 2001, before the Court's motion deadline. On December 13, 2001, Judge Whaley transferred this case to Judge Shea. (Ct. Rec.158.) That transfer necessitated moving the hearing on their motion to January 31, 2002, well beyond the deadline. At that hearing, this Court denied the motion to strike, (Ct.Rec.175), construed it as a motion to compel and ordered production of several items, (Ct.Rec.184). The Court, recognizing that ordering discovery might require supplementation or amendment of the pending motions, timely filed on January 7, 2002, conferred with counsel and decided that it would allow the Defendants to supplement their filings.

On March 15, as required by this Court's order, the Defendants filed a Supplemental Memorandum in Support of their Motion to Exclude Opinion Testimony of Plaintiff's Experts Dr. William W. Au and Wolfgang Hoffman Under Evidence Rule 702. (Ct.Rec.192.) On April 5, 2002, as required by this Court's order, the Plaintiffs filed their Supplemental Memorandum in Opposition to Defendants' Motions to Exclude Opinion Testimony of Plaintiffs' Experts and for Summary Judgment. (Ct.Rec.199.) On April 12, 2002, as required by this Court's order, the Defendants filed their reply memoranda in support of their motions for Summary Judgment Dismissal of Plaintiff's PLA and State Law Claims, (Ct.Rec.208), and to Exclude Opinion Testimony of Plaintiff's Experts Dr. William W. Au and Wolfgang Hoffman Under Evidence Rule 702, (Ct. Rec.209).

## II. Discussion

### A. Motion to Exclude Experts under *Daubert*

#### 1. *Daubert* Standard

Federal Rule of Evidence 702 allows admission of a qualified expert if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FED. R. EVID. 702. To qualify under this rule, expert testimony must pass a preliminary assessment by the trial judge that (1) the reasoning or methodology is scientifically valid and (2) the reasoning or methodology can "properly be applied to the facts in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993). *Daubert* requires the experts' testimony "reflect 'scientific knowledge,' ... their findings [be] 'derived by the scientific method' and ... their work product amount to 'good science.'" *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1315 (9th Cir.1995) (*Daubert II*) (quoting *Daubert*, 113 S.Ct. at 2795, 2797). Daubert also requires that the proposed testimony have a "valid scientific connection to the pertinent inquiry as a precondition of admissibility." *Daubert*, 509 U.S. at 591–92, 113 S.Ct. at 2796.

To guide district courts in applying the foregoing, the Supreme Court suggested

four factors: (1) whether a theory or technique can be or has been tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) the known or potential rate of error, and (4) whether the theory or technique has attained "general acceptance" in the relevant scientific community. *Daubert,* 509 U.S. at 593–94, 113 S.Ct. at 2796–97. The Ninth Circuit has acknowledged that these factors are illustrative and may not be applicable in some cases. "Rather we read the Supreme Court as instructing us to determine whether the analysis undergirding the expert's testimony falls within the range of accepted standards governing how scientists conduct their research and reach their conclusions. *Daubert II,* 43 F.3d at 1316–17. Here, the issue is not whether the technique of cytogenetic analysis itself is the proper subject of expert testimony,[3] but whether the opinions of Dr. Au and Dr. Hoffman, based upon that analysis comport with Daubert. In this situation the Supreme Court has explained that: "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion prof-

fered." *General Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

**Analysis**

### i. Dr. Au

■ Dr. Au performed a cytogenetic evaluation on nine of the Worker Plaintiffs.[4] According to Dr. Au, it is possible to determine whether a group has been exposed to radiation and to estimate the dose by looking for cytogentic effects on the subject's blood, principally lymphocytes.[5] First, the Worker Plaintiffs were matched with nine controls with respect to gender, job title, smoking status and age.[6] On April 28, 1998, and June 9, 1998, blood samples were collected from these two groups. After a standard preparation, two analyses were performed: a traditional cytogenetic assay and a FISH assay. Both procedures involve counting the number of chromosomal aberrations present in cells taken from the blood.

In the traditional assay, the technician, Sylvia Szucs, examined two sets of 200 cells for each participant.[7] For each cell analyzed, Ms. Szucs examined the chromosomes under a high power microscope to determine whether, in her judgment, there was an aberration. Once all the cells were scored, the data was summarized in terms of aberrations per 100 cells.[8] The code

---

3. The Third Circuit accepted expert testimony regarding cytogenetic analysis in the Three Mile Island case. *In Re TMI Litig.,* 193 F.3d 613, 692–93 (3rd Cir.1999) (*"In re TMI Litigation"*).

4. Cytogenetics is "[t]he branch of genetics concerned with the structure and function of the cell, especially the chromosomes." *In Re TMI Litig.,* 193 F.3d 613, 688 n. 121 (3rd Cir.1999) (quoting STEDMAN'S MEDICAL DICTIONARY 436 (26th ed.1995)).

5. A lymphocyte is "[a] white blood cell formed in lymphatic tissue throughout the body." STEDMAN'S MEDICAL DICTIONARY 1008 (26th ed.1995).

6. The control group here is a set of individuals who were not exposed to the May 14, 1997, accident. Such a group is necessary to establish a point of comparison for the Plaintiffs' blood.

7. Dr. Au's lab followed a blind scoring system which ensured that neither Ms. Szucs nor Dr. Au knew the identity, or category, of any sample analyzed until after scoring was complete.

8. Defendants object, on *Daubert* grounds, to Ms. Szucs scoring because (1) she admitted that she tends to find more aberrations than other technicians and (2) the lack of quality control. (*See e.g.* Ct. Rec. 196 Supp. Decl. of

was then broken and the data analyzed. Dr. Au concluded that there was no statistical difference between the subject and control groups.[9] Based upon the traditional assay therefore, Dr. Au could not opine that the plaintiffs were exposed to radiation in excess of the regulatory limits.

In the FISH assay, Ms. Szucs stained the slides containing the lymphocytes which results in some chromosomes being visible as orange while others were visible as blue. A cell with no abnormalities should have six chromosomes stained entirely orange. "Any shift in color between orange and blue in a chromosome would indicate abnormalities . . . ." (Ct. Rec. Ex. 5 at 6.) Ms. Szucs then examined the chromosomes to check for abnormalities, detailing whether the abnormality was a translocation, a dicentric, an accentric or a ring. She took pictures of any cells which she believed contained abnormalities.[10] Once all the cells were scored, the code was broken and the data analyzed. The

only result that bordered on statistical significance was the frequency of dicentrics.[11] Using a two-sided p-value statistical analysis,[12] Dr. Au concluded that the observed difference was not statistically significant. However, using a one-sided p-value test, the difference was significant.

The Defendants challenge the use of a one-sided p-value test as not good science. Their expert, whom the Plaintiffs have not challenged, states: "A one-sided test should be used only in a situation where there is compelling evidence that the difference between groups could go only in one direction." (Ct. Rec. 167 Ex. 12 Decl. of Nayak Polissar Ex. C at 5.) Defendants point out that the issue in dispute is whether there was *any* exposure to radiation at all in the May 14, 1997, incident. If the null hypothesis were true, it would be just as likely that the Plaintiffs have been exposed to less radiation than the controls as more radiation than the controls. Dr. Au has justified his use of the one-sided p-

---

Antone Brooks Ex. A Supp. Report of Antone Brooks). Having reviewed both the Declaration of Sylvia Szucs, (Ct.Rec.202), and the excerpts of her deposition testimony (Ct. Rec. 194 Ex. A), the Court is not persuaded that her data collection techniques are unreliable under *Daubert*. *See In Re TMI Litig.*, 193 F.3d at 663.

9. Statistical analysis is used to test the "null hypothesis" which assumes that any difference between the two groups is based upon random variation across the population and not the identified characteristic distinguishing the subject and control groups. The analyst uses statistical tools to calculate the probability that the difference seen is caused by random variation. If that probability is low enough, commonly five percent, then the result is deemed statistically significant and the null hypothesis rejected. Here, the null hypothesis is that the subject group was not exposed to radiation during the incident. To conclude that there was exposure to radiation, the scientist must reject the null hypothesis by demonstrating that the variation in rate of aberrations between the subject group

and the control group is statistically significant.

10. Defendants argue that the FISH results are not reliable, among other reasons because (1) these pictures are inadequate to check Ms. Szucs scoring and (2) the pictures were never matched with the aberrations noted. The Court concurs with Dr. Au that the lack of photographs documenting each aberration Ms. Szucs observed does not make her conclusions unreliable. (Ct. Rec. 204 Supp. Decl. of William W. Au at ¶ 5 ("[P]hotos are not required for traditional cytogenetic assays, especially from well-established laboratories").)

11. *See In re TMI Litig.*, 193 F.3d 613, 688 n. 124 (3rd Cir.1999) (defining a "dicentric").

12. A two-sided p-value tests for a statistically significant difference between populations where the difference may go in either direction, *i.e.* the control group may have a higher or a lower rate of aberrations. (Ct. Rec. 167 Ex. 12 Decl. of Nayak Polissar Ex. C at 5.)

value by declaring: "Contrary to the position advanced by defendant's witnesses, the statistical methodology employed in my study is routinely used in my scientific investigations and accepted in the peer review literature." (Ct. Rec. 167 Ex. 7 Dec. 3, 2001 Decl. of William Au at ¶ 4.) Absent citation to supporting references, this appears to be classic *ipse dixit*, as the Supreme Court identified in *General Elec. Co. v. Joiner.* 522 U.S. at 146, 118 S.Ct. 512.

Plaintiffs have responded to this argument by stating: "The one sided p value statistical method is the most appropriate indicator of radionuclide exposure in this case. One sided "p value" statistical valuation presumes—consistent with scientific knowledge—that while radionuclide exposure may result in chromosomal damage, there is no reasonable likelihood that radionuclide exposure will correct chromosomal aberrations." (Ct. Rec. 177 at 10 n. 30.) However, such an assertion assumes the fact to be proved—the Plaintiffs' exposure to radiation exceeds the controls. As Dr. Polissar states the problem: "the one-sided p-value assumes that the subject group can only have a higher rate of aberrations than the control group." (Ct. Rec. 167 Ex. 12 Decl. of Nayak Polissar Ex. C at 5.) As that is the exact conclusion the assay was designed to test, Dr. Au's use of the one-sided p-value in this assay is not a scientifically valid use on these facts. *Daubert II*, 43 F.3d at 1316 (holding that a party presenting an expert must show some independent, objective validation of the expert's methodology). Without the one-sided p-value, none of Dr. Au's results demonstrate statistical significance. In the absence of a statistically significant difference upon which to opine, Dr. Au's opinion must be excluded under *Daubert*. *See General Elec. Co. v. Joiner*, 522 U.S. at 146, 118 S.Ct. 512 (affirming exclusion of expert testimony because, among other

problems, the data relied upon did not justify a finding of statistical significance).

Defendants also attack Dr. Au's dosage exposure estimates as unreliable, and, therefore argue they must be excluded. Dr. Au relied upon two studies in translating the observed difference in chromosomal aberrations between the subjects and the controls to exposure doses: M.A. Bender et al., *Current Status of Cytogenetic Procedures to Detect and Quantify Previous Exposures to Radiation*, 196 Mutat. Res. 103 (1988); L.G. Littlefied et al., *Do Recorded Doses Overestimate True Doses Received by Chernobyl Cleanup Workers? Results of Cytogenetic Analyses of Estonian Workers by Fluorescence In Situ Hybridization*, 150 Rad. Res. 237 (1998). (Ct. Rec. Ct. Rec. 167 Ex. 6 at 4.) The Bender articles observes:

> It was noted that internally deposited radioactive materials can result in an increase in the frequency of chromosomal aberrations in blood lymphocytes of exposed human populations. However, there are many physical variables associated with human studies, including the combined exposure to both internal and external radiation, the lack of accurate dosimetry, and the nonuniform distribution of the material in the body at the organ or cell level. When these variables are combined with biological variables such as sampling the proper cell population and estimating the fraction of the lymphocyte cell population exposed, it is not possible to derive dose-response relationships for internally deposited radioactive material.

Bender at 131, (Ct. Rec. 194 Ex. F). The Bender article therefore provides no support for Dr. Au's attempt to estimate a dose exposure from the rate of chromosomal aberrations.

The Littlefield study from which Dr. Au also draws support is similarly unavailing. There, blood lymphocytes from six individ-

uals was exposed *in vitro* [13] to an identified dose of x-ray radiation. (Ct. Rec. Ct. Rec. 167 Ex. 12 at ¶ 20.) Then a curve was plotted relating the radiation dose to an observed increase in chromosomal aberrations. (Ct. Rec. 204 Supp. Decl. of Dr. Au at ¶ 12.) However, as elucidated by Dr. Brooks, there are two flaws with the analogy Dr. Au tries to draw: Littlefield's *in vitro* study does not translate to *in vivo* situations, and x-ray radiation has a different dose-response relationship from plutonium, which is an alpha radiation emitter. (Ct. Rec. 167 Ex. 10 Brooks Decl. ¶ 5.) *See also* Hoffman, *Report on Hanford Nuclear Workers Accident May 14, 1997—Evaluation of Cytogenetic Results,* at 18 ("[T]he shape of the *in vitro* calibration curve is determined by the specific type of radiation. The latter therefore needs to be stated in conjunction with any *in vivo* dose estimate that is based upon this curve."). (Ct. Rec. 167 Ex. 9 § 7.3.1 at 18.) Dr. Brooks has explained that the difference between direct exposure to x-ray radiation and inhalation exposure to alpha radiation make a dose estimate of the latter based upon a known curve from the former unreliable because the two types of radiation differ as to a key factor in causing dicentrics in lymphocytes: ability to penetrate body tissue. (Ct. Rec. 167 Ex. 10 Brooks Decl. ¶ 5.) Lymphocytes can only be damaged by radiation that reaches them. (*Id.*) Because x-rays and alpha particles have different abilities to penetrate, it takes a different amount of radiation exposure in the lungs to cause an observed increase in dicentrics. (*Id.*) Dr. Au's response to this criticism was to say that:

> the comparison was not based on comparing alpha with x-ray irradiation but

based on comparable increase [sic] of chromosome aberrations in each of the in vivo and in vitro studies. In our study, we observed a 75% increase in chromosome aberration frequencies in the exposed workers compared with the matched controls. With a similar increase of chromosome aberrations in Littlefield's study, it indicated that the exposed workers were exposed to an "equivalent of 10 cGy ionizing radiation."

(Ct. Rec. 204 Supp. Decl. of Dr. Au at ¶ 12.) This attempted rebuttal does not address the break in reasoning. Dr. Au used the relationship between increase in frequency and dose for one type of radiation to derive his dose estimate for the Plaintiffs. But, Dr. Brooks, and for that matter, Dr. Hoffman, explain that the relationship between those two variables is dependent upon the type of radiation to which the lymphocytes are exposed. Indeed, the Bender article upon which Dr. Au relies states that while one can use cytogenetic analysis to estimate exposure to penetrating forms of radiation, one cannot do so for the non-penetrating alpha radiation:

> As described in more detail in chapter 4 of this report, the frequency of chromosomal aberrations in peripheral blood lymphocytes can be used to estimate radiation dose. This is relatively straightforward in the cases of external exposure to penetrating radiations such as γ-rays or fast neutrons. For internal exposures, however, and particularly for particulates or for α particles, meaningful dosimetry is difficult if not impossible.

Bender at 128, (Ct. Rec. 194 Ex. F).[14] Dr. Au provides no support for his assumption

---

**13.** *In vitro* exposure occurs when the blood is directly exposed to a dose of radiation. *In vivo* exposure occurs when a subject is exposed to radiation either through epidermal (skin) exposure or inhalation.

**14.** As is fully discussed hereinafter, Dr. Hoffman's analysis also fails to consider how the difference in forms of radiation impacts the ability to estimate doses.

that the curve for x-ray radiation can be used for alpha radiation as well, which as shown above, is a highly questionable assumption. Dr. Au's methodology to derive a dose estimate therefore has not been objectively or independently validated, and is therefore scientifically unsound. *Daubert II*, 43 F.3d at 1316. This failure to link the dose estimates in a reliable way to the observed increase in chromosomal aberrations creates an analytical gap between the data and the opinion offered. Accordingly, the Court excludes Dr. Au's opinion as to exposure estimates. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proferred."); *see also In Re TMI Litig.*, 193 F.3d at 692–93 (excluding dose estimates under *Daubert*).

### ii. Dr. Hoffman

■ The Defendants attack Dr. Hoffman's methodology for several reasons: (1) his assumption that the dose-response curve reported for Cobalt (Co–60) gamma (γ) radiation is valid for Plutonium, which emits alpha (α) radiation, is unsupportable, (2) the data itself demonstrates that his use of the Poisson distribution is not valid and (3) his rejection of Dr. Au's control group is unwarranted.

Dr. Hoffman's opinion as to radiation dose, like Dr. Au's, relies upon a dose-response curve to derive Dr. Hoffman's estimate of the Plaintiffs' radiation exposure: "In this commentary, published values for dose response curves of Co–60 γ-irradiation *in vitro* will be used exclusively." (Ct. Rec. 167 Ex. 9 Hoffman Report at 18.) Dr. Hoffman's dose estimate therefore assumes that the curve generated by *in vitro* exposure of blood to Cobalt-60 gamma radiation applies to *in vivo* exposure to Plutonium alpha radiation. Bender demonstrates that Hoffman's assumption is unfounded for two reasons: (1)

while cytogenetic analysis allows estimation of gamma radiation dose, alpha radiation dose is difficult if not impossible to reconstruct, and (2) confounding variables make dose estimates impossible in this case.

First, Bender contrasts dosimetry for gamma radiation with dosimetry for alpha radiation:

> As described in more detail in chapter 4 of this report, the frequency of chromosomal aberrations in peripheral blood lymphocytes can be used to estimate radiation dose. This is relatively straightforward in the cases of external exposure to penetrating radiations such as γ-rays or fast neutrons. For internal exposures, however, and particularly for particulates or for α particles, meaningful dosimetry is difficult if not impossible.

Bender at 128, (Ct. Rec. 194 Ex. F). To be sound science, Dr. Hoffman's methodology must be objectively and independently validated. *Daubert II*, 43 F.3d at 1316. Far from validating Dr. Hoffman, Bender directly contradicts him. Without validation, the Court is left with Dr. Brooks' opinion, consistent with Bender, that "[t]he chromosome damage produced by direct dose from × or gamma rays cannot be compared to aberrations induced by plutonium exposure." (Ct. Rec. 167 Decl. of Antone L. Brooks, Ph.D. ¶ 5.) In a case where the scientific literature says that one cannot estimate exposure dose for internal exposure to alpha radiation but one can for external exposure to gamma radiation, Dr. Hoffman's use of a gamma radiation curve to estimate alpha radiation exposure must be justified to merit admissibility under *Daubert*. Dr. Hoffman makes no attempt to do so, and indeed, admits that it is inappropriate: "the shape of the *in vitro* calibration curve is determined by the specific type of radia-

tion." (Ct. Rec. 167 Ex. 9 Hoffman Report at 18.) In the absence of any explanation for his methodology, Dr. Hoffman's opinion as to the dose of radiation to which the Plaintiffs were exposed is based on his *ipse dixit*, which this Court does accept as his methodology does not meet the *Daubert* test. *See General Elec. Co. v. Joiner*, 522 U.S. at 146, 118 S.Ct. 512.

Second, Bender states that confounding variables related to internal exposure render the calculation of a dose-response curve impossible:

> It was noted that internally deposited radioactive materials can result in an increase in the frequency of chromosomal aberrations in blood lymphocytes of exposed human populations. However, there are many physical variables associated with human studies, including the combined exposure to both internal and external radiation, the lack of accurate dosimetry, and the nonuniform distribution of the material in the body at the organ or cell level. When these variables are combined with biological variables such as sampling the proper cell population and estimating the fraction of the lymphocyte cell population exposed, it is not possible to derive dose-response relationships for internally deposited radioactive material.

Bender at 131, (Ct. Rec. 194 Ex. F). As with Dr. Au, Dr. Hoffman does not explain why, given the scientific literature that rejects his task as impossible, his method of estimating doses has accounted for these variables. This persuasive scientific literature demonstrates that the method he used to estimate doses is scientifically unsound. Therefore, Hoffman's opinion of the dose of radiation to which the Worker Plaintiffs were exposed is excluded under *Daubert. Daubert II*, 43 F.3d at 1316.[15]

**B. Motion for Summary Judgment**

**1. Standard for Summary Judgment**

Summary judgment will be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). When considering a motion for summary judgment, a court may not weigh the evidence nor assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists only if "the evidence is such that a reasonable jury could return a verdict" for the party opposing summary judgment. *Id.* at 248, 106 S.Ct. 2505. In other words, issues of fact are not material and do not preclude summary judgment unless they "might affect the outcome of the suit under the governing law." *Id.* There is no genuine issue for trial if the evidence favoring the non-movant is "merely colorable" or "not significantly probative." *Id.* at 249, 106 S.Ct. 2505.

If the party requesting summary judgment demonstrates the absence of a genuine material fact, the party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial" or judgment may be granted as a matter of law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. This requires the party opposing summary judgment to present or identify in the record evidence sufficient to establish the existence of any challenged element that is essential to that party's

---

**15.** Finding that Dr. Hoffman's opinion must be excluded under *Daubert* for the first reason suggested by Defendants, the Court declines to address Defendants additional arguments for exclusion.

case and for which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Failure to contradict the moving party's facts with counter affidavits or other responsive materials may result in the entry of summary judgment if the party requesting summary judgment is otherwise entitled to judgment as a matter of law. *See Anderson v. Angelone,* 86 F.3d 932, 934 (9th Cir.1996).

## 2. Analysis

This Court has original jurisdiction of any "public liability action arising out of or resulting from a nuclear incident" in this district. 42 U.S.C. § 2210(n)(2). A "public liability action" is a suit asserting "any legal liability arising out of or resulting from a nuclear incident." 42 U.S.C. § 2014(w), (hh). A "nuclear incident" is "any occurrence, including an extraordinary nuclear occurrence, with the United States causing ... bodily injury, sickness, disease, or death, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material." 42 U.S.C. § 2014(q).[16]

▉ In order to prevail on a PLA claim, these Plaintiffs must demonstrate, *inter alia,* that they were exposed to radiation in excess of the maximums established by the federal safety regulations.

*Roberts,* 146 F.3d at 1308; *O'Conner,* 13 F.3d at 1105; *Lokos v. Detroit Edison,* 67 F.Supp.2d 740, 743 (E.D.Mich.1999). Plaintiffs argue they must only demonstrate release of radiation in excess of federal regulations and exposure to the release, whether or not that exposure was in excess of federal regulations, not exposure to radiation in excess of federal regulations.[17] (Ct. Rec. 178 at 15) (citing *In re TMI Litig.,* 193 F.3d 613, 659 (3rd Cir. 1999).) However, the cited portion of *In re TMI Litigation* merely quotes the Third Circuit's previous holding in *TMI. See In re TMI Litig.,* 193 F.3d at 659 (citing *In re TMI,* 67 F.3d at 1119). Perusing *TMI* reveals that the court's interpretation was based upon 10 C.F.R. § 20.105 and 20.106, which were in effect when the Three Mile Island accident occurred in 1979, not the regulations that were in force at the time of this incident, May 1997. *TMI,* 67 F.3d at 1108 n. 10 ("In this case, the relevant federal regulations were those in place at the time of the TMI accident in 1979."). *TMI* also noted that the regulations in force at the time of its 1995 decision were not the same regulations that existed in 1979. *TMI,* 67 F.3d at 1111 n. 19. ("The regulations have been significantly modified since 1979. *See generally* 10 C.F.R. chs. 20, 50 (1995).").

In 1979, 10 C.F.R. §§ 20.105–.106 (1979) governed permissible levels of radiation and radioactivity in "unrestricted areas."[18]

---

16. Although state tort law nominally provides the rules of decision for such an action, 42 U.S.C. § 2014(hh) ("[T]he substantive rules for decision in such action shall be derived from the law of the State in which the nuclear incident occurs, unless such law is inconsistent with the provisions of this section."), federal courts have consistently held that Congress intended federal standards to preempt state law. *See e.g. Roberts v. Florida Power & Light Co.,* 146 F.3d 1305, 1308 (11th Cir.1998); *In re TMI,* 67 F.3d 1103, 1107 (3rd Cir.1995); *O'Conner v. Commonwealth Edison Co.,* 13 F.3d 1090, 1105 (7th Cir.1994).

17. Defendants point out that under the law of the case doctrine, the Court may not reconsider an issue it previously decided. *See Milgard Tempering, Inc. v. Selas Corp. of Am.,* 902 F.2d 703, 715 (9th Cir.1990). However, application of the doctrine is discretionary. *Id.* Because the Court concludes that the prior ruling was correct, it is unnecessary to rule on application of any exception to the doctrine.

18. An "unrestricted area," as that term was defined in the federal regulations existing in 1979, was "any area access to which is not

Section 20.105 required that, except as authorized by the Nuclear Regulatory Commission ("NRC") no licensee shall create in an unrestricted area: "[r]adiation levels which, if an individual were continuously present in the area, could result in his receiving a dose in excess of" two millirems in one hour, or 100 millirems in any week. 10 C.F.R. § 20.105(b) (revised 1991). Section 20.106 required that "[a] licensee shall not possess, use, or transfer licensed material so as to release to an unrestricted area radioactive material in concentrations which exceed the limits specified in Appendix B, Table II of this part, except as authorized . . . ." 10 C.F.R. § 20.106 (revised 1991). *TMI* interpreted these regulations, to establish a violation whenever radiation exceeding the prescribed levels, "whether or not persons actually are located in the exposed areas." *TMI*, 67 F.3d at 1116.

In 1991, the Nuclear Regulatory Commission amended the federal regulations to incorporate updated scientific information and to reflect changes in the basic philosophy of radiation protection. *See* Standards for Protection Against Radiation, 56 Fed.Reg. 23360 (May 21, 1991) (codified at 10 C.F.R. § 20 (2002)). 10 C.F.R. § 20.105 and 20.106, which *TMI* interpreted, no longer exist. In their place, the Code of Federal Regulations contains 10 C.F.R. § 20.1301, which requires licensees to conduct operations so that "[t]he total effective dose equivalent to individual members of the public from the licensed operation does not exceed 0.1 rems (1 millisievert) in a year . . . ." 10 C.F.R. § 20.1301 (2002). Rather than bar release of radiation above a certain amount, the regulations bar *exposure* above a specified amount.

Similarly, the federal regulation in force at the time of the May 14, 1997, accident, and applicable to the Defendants duties to Plaintiffs here,[19] limit "the Occupational dose" a general employee can receive. Occupational Dose Limits for General Employees, 10 C.F.R. § 825.202 (2002). Rather than bar release of radiation above a certain amount, the regulations bar *exposure* above "a total effective dose equivalent of 5 rems (0.05 sievert)." *Id.* at (a)(1). The Court therefore holds that to survive summary judgment, the Plaintiffs must establish facts creating a genuine issue as to whether they were exposed to radiation above 5 rems.

Plaintiffs have proffered the expert opinions of Dr. William Au and Wolfgang Hoffman to support their assertion of exposure. Above the Court excluded, on *Daubert* grounds, the opinions Dr. Au and Dr. Hoffman gave as to the exposure dose received by the Plaintiffs. As this is the only evidence Plaintiffs have of exposure, summary judgment is proper in favor of Defendants on the Plaintiffs' PLA claims.[20] However, even were the Court to consider the opinions of Dr. Au and Dr. Hoffman, it

---

controlled by the licensee for purposes of protection of individuals from exposure to radiation and radioactive materials, and any area used for residential quarters." 10 C.F.R. § 20.1(a)(17) (1979).

**19.** The Worker Plaintiffs are not members of the general public, rather, as all parties agree, they are general employees. Moreover, since the Hanford Nuclear Reservation is a Department of Energy facility, the applicable federal regulations were issued by the Department of Energy.

**20.** The Plaintiffs expend considerable effort enumerating the alleged misdeeds of the Defendants before, during and after the incident in question. The Court expresses no opinion on such facts because they are irrelevant to the issue addressed by the present motion: can Plaintiffs survive summary judgment on their PLA claims for failure to demonstrate excessive exposure to radiation?

would still grant summary judgment in favor of the Defendants.

■ On August 13, 2001, Dr. Au gave as his opinion that the Plaintiffs, "as a group, could have been exposed chromosome damaging agents equivalent to 10 cGy ionizing radiation."[21] (Ct. Rec. 167 Ex. 6 Au Decl. ¶ 4D.) Further, that exposure was to "low level radioactive and/or radiomimetic and/or non-radioactive chemicals." (*Id.* at ¶ 4A.) On December 3, 2001, Dr. Au re-expressed that opinion by declaring that "the subjects of the study, as a group, were exposed to low levels of radioactive and/or toxic chemicals as a result of the accident of May 14, 1997 at the Hanford site, Richland, Washington, equivalent to an approximate range of 10 cGy x-rays over the controls." (Ct. Rec. 180 Ex. 48 Dec. 3, 2001 Au Decl. ¶ 3.) As explained above, to survive Defendant's motion for summary judgment, Dr. Au would have to opine that the Plaintiffs were exposed to 5 rems or more of radiation. He simply does not say that. He says that he found chromosomal aberrations which could have been caused by chromosome damaging agents. He says that those agents could be radioactive, radiomimetic, non-radioactive or toxic chemicals. Finally, he says that the damage is consistent with an exposure to up to 10 cGy x-rays. He simply does not say that the damage was caused by exposure to radiation. The definition of a "nuclear incident" in the Price–Anderson Act limits a PLA cause of action to injuries "arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material." 42 U.S.C. § 2014(q). Price–Anderson Act liability only attaches if the injuries are caused by the harmful properties of one of these substances. "Source material" is "(1) uranium, thorium,

or any other material which is determined by the Commission . . . to be source material; or (2) ores containing one or more of the foregoing materials . . . ." 42 U.S.C. § 2014(z). There is no evidence of exposure to source material. "Special nuclear material" is "(1) plutonium, uranium enriched in the isotope 233 or in the isotope 235, and any other material which the Commission . . . determines to be special nuclear material, but does not include source material; or (2) any material artificially enriched by any of the foregoing, but does not include source material." 42 U.S.C. § 2014(aa). "Byproduct material" is "(1) any radioactive material (except special nuclear material) yielded or made radioactive by exposure to the radiation incident to the process of producing or utilizing special nuclear material, and (2) the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content" 42 U.S.C. § 2014(e). These definitions do not include non-radioactive, or toxic chemicals. Therefore, one cannot aggregate the damage caused by other toxic chemicals with the damage caused by radiation to achieve the required threshold. Accordingly, Dr. Au's opinion is insufficient to create a genuine issue of material fact regarding the Plaintiff's exposure to 5 rems of radiation because he does not opine that *exposure to radiation* caused the observed damage.

■ Dr. Hoffman's opinion is also insufficient. On July 25, 2001, Dr. Hoffman gave his opinion that the Worker Plaintiffs "were exposed to an equivalent whole body radiation dose (Co–60 γ-rays) of 10–84 mGy with the central estimate of 34 milligrays for the group." (Ct. Rec. 167 Ex. 9, Decl. of Wolfgang Hoffman, M.D., M.P.H.,

**21.** 1 cGy converts to 1 rem. (Ct. Rec. 180 Ex. 60, Dep. of Wolfgang Hoffman, M.D. M.P.H. at 39 l. 4–8.)

¶ 4A.) According to Dr. Hoffman, this estimate corresponds to a dose of 1–8.4 rem with a central estimate of 3.4 rem. (Ct. Rec. 180 Ex. 60, Dep. of Wolfgang Hoffman, M.D. M.P.H. at 41 l. 4–7.) Dr. Hoffman's opinion is that the Plaintiffs, as a group were exposed to 3.4 rems. 3.4 is less than 5 rems. Exposure to less than 5 rems is allowable under the applicable federal regulation. *See* 10 C.F.R. § 825.202 (2002). Hoffman's opinion also includes a boundary of 1 rem to 8.4 rems, which was generated by including the error rate for his calculation. The fact that this boundary includes exposures above 5 rems does not save Plaintiffs' case because Dr. Hoffman's opinion remains that the Worker Plaintiffs were exposed to 3.4 rem. Additionally, Dr. Hoffman makes no attempt to estimate individual doses. To recover under the PLA, *each* Plaintiff must establish that he or she was exposed to 5 rems, rather than that as group they were exposed to 5 rems. *See e.g. Lokos,* 67 F.Supp.2d at 743 ("To prevail in their PLA, plaintiffs must prove .... [plaintiff's] exposure exceed the federal numerical dose limits .... "). Just as two individuals who admit that while one was exposed to 10 rems and the other to zero rems could not survive summary judgment by claiming that as a group, they were exposed to an average of 5 rems, the Worker Plaintiffs here cannot survive summary judgment by claiming an average exposure. Each individual Worker Plaintiff must adduce evidence of his or her individual exposure in excess of the federal limits to prevail on their individual PLA claim. Dr. Hoffman's opinion does not provide evidence on this issue.

Having failed to present or identify in the record evidence sufficient to establish excessive exposure to radiation, the Worker Plaintiff's PLA claims are dismissed with prejudice. The Family Plaintiffs "do not assert federal jurisdiction under the Price–Anderson Act on the basis of Family Plaintiffs' exposure." (Ct. Rec. 167 Ex. 16 Plaintiffs' Unified Family Member Responses to B & W Hanford's First Set of Interrogatories and Requests for Production at 3.) Therefore, the only possible basis for the Family Plaintiffs' PLA claims is as a derivative to the Worker Plaintiffs' claims.[22] Having dismissed the Worker Plaintiff's PLA claims, the Court also must dismiss the Family Plaintiffs' PLA claims.

## C. Supplemental Jurisdiction

■ Having been granted dismissal of the only federal cause of action, the Defendants assert that the entire case should be dismissed for want of jurisdiction. This Court has supplemental jurisdiction over the remaining claims based upon 28 U.S.C. § 1367(a), because they arise from the same facts as the PLA claims. *See id.* This Court may decline to exercise its supplemental jurisdiction if, *inter alia,* "the district court has dismissed all claims over which it had original jurisdiction." *Id.* at (c)(3). This Court *may* retain jurisdiction even after the basis for original jurisdiction is removed. *Watkins v. Grover,* 508 F.2d 920, 921 (9th Cir.1974). In making that decision, a district court may appropriately consider "the values of economy, convenience, fairness, and comity." *Harrell v. 20th Century Ins. Co.,* 934 F.2d 203, 205 (9th Cir.1991) (quoting *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 351, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)).

Here, the relevant interests favor retention of jurisdiction. These cases have been

---

**22.** *see supra* n. 14 (explaining that state tort law provides the rules of decision unless inconsistent with federal standards). Washington state law allows certain family members to recover loss of consortium damages. *Reichelt v. Johns–Manville Corp.,* 107 Wash.2d 761, 773, 733 P.2d 530 (1987).

pending in this Court for more than two years, during which time, this Court has become familiar with the factual and legal details of the dispute. Economy therefore favors retention. The Defendants have asserted that jurisdiction would be proper in the Benton County Superior Court. This Court is no less convenient, as the United States Courthouse is in Richland, in Benton County. Likewise, neither fairness nor comity favor declination of jurisdiction. The Court therefore retains jurisdiction of these cases pursuant to 28 U.S.C. 1367.

### D. Other Moving Parties

In its order of November 30, 2000, this Court denied motions to dismiss and for summary judgment for reasons unrelated to the public liability action claim, deeming them renewed after the jurisdictional question had been answered by the present motion for summary judgment. That holding was reaffirmed on April 25, 2001, when the Court explicitly continued all pending motions until the jurisdictional issue matter had been addressed by the Court. (Ct.Rec.132.) Since the summary judgment motions addressing Price–Anderson Act jurisdiction were filed, Defendants Hanford Environmental Foundation and Dr. Lawrence Smick, (Ct.Rec. 173), and Kadlec Medical Center, (Ct.Rec. 176), have renewed their motions. Both seek alternative relief: (1) dismissal for the reasons stated in their original moving papers or (2) joinder in Defendants Fluor and BWHC's motion for summary judgment dismissal of state-law claims in favor of state court proceedings. The Court is not prepared to address the merits of the original motions at this time, and denies them with leave to renew. As to the second alternative, the Court concluded that it would exercise supplemental jurisdiction over the state claims. The motions are therefore denied. Accordingly,

**IT IS HEREBY ORDERED:**

1. Co–Defendants B & W Hanford Company's and Fluor Hanford Company's Motion to Exclude Opinion Testimony of Plaintiff's Experts Dr. William W. Au and Wolfgang Hoffman Under Evidence Rule 702, **(CT–00–5021–EFS, Ct. Rec. 161; CY–00–3038–EFS, Ct Rec. 81), is GRANTED.**

2. Co–Defendants Fluor and BWHC's Motion for Summary Judgment Dismissal of Plaintiff's PLA and State Law Claims, **(CT–00–5021–EFS, Ct. Rec. 165; CY–00–3038–EFS, Ct. Rec. 86), is GRANTED IN PART AND DENIED IN PART.**

3. Count One of the Complaint, the Price Anderson Act claim, is **DISMISSED WITH PREJUDICE.**

4. Defendants Hanford Environmental Foundation and Dr. Lawrence Smick's Renewal of Motion to Dismiss or, in the Alternative, Joinder in Co–Defendants Fluor and BWHC's Motion for Summary Judgment, **(CT–00–5021–EFS, Ct. Rec. 173; CY–00–3038–EFS, Ct. Rec. 92), is DENIED.**

5. Defendant Kadlec Medical Center Renewal of Motion to Dismiss or, in the Alternative, Joinder in Co–Defendants Fluor and BWHC's Motion for Summary Judgment, **(CT–00–5021–EFS, Ct.Rec. 176), is DENIED.**

**IT IS SO ORDERED.** The District Court Executive is directed to

(A) Enter this Order; and

(B) Provide copies to all counsel.